# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 8, 2010

## JOSEPH MARION BARKER v. ANGEL CHANDLER

**Direct Appeal from the Chancery Court for Gibson County**
**No. 16976      George R. Ellis, Judge**

---

**No. W2010-01151-COA-R3-CV - Filed June 29, 2010**

---

This is the second appeal from a parenting plan entered by the trial court. The only issue in both appeals involved the necessity of a "paramour provision" in the parenting plan. On remand from the first appeal, the trial court was directed by this Court to determine whether a paramour provision was in the best interests of the children. After a hearing, the trial court determined that it was in the best interests of the children to have a paramour provision in effect. Mother appealed. After reviewing the record, we find that the trial court abused its discretion by requiring a paramour provision as the record is devoid of any evidence to support a finding that the paramour provision is in the best interests of the children. Reversed.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Reversed**


J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Lucian T. Pera, Brian S. Faughnan, Memphis, Tennessee; Christine P. Sun, New York, New York; Tricia R. Herzfeld, Nashville, Tennessee, for the appellant, Angel Chandler.

No Appellee Brief was filed.


## OPINION


This is the second appeal in this case involving the trial court's refusal to eliminate an overnight paramour restriction from the parties parenting plan. The facts as stated in the first appeal and supported by the record in this appeal are as follows:

[Appellant] Angel Chandler ("Mother") and [Appellee] Joseph Marion Barker ("Father") were married in February 1992. They had two children during the marriage, Z.B., born April 9, 1993 ("Son"), and C.B., born May 10, 1995 ("Daughter"). After Father engaged in an extramarital affair with his now-current wife, Mother filed a petition for divorce. In November 1998, the trial court entered a final decree of divorce, in which Mother was designated as the primary residential parent of Daughter, and Father was designated as the primary residential parent of Son. Each parent had regular parenting time with the child who lived with the other parent. This parenting plan did not include any provision restricting the parents from having any person present, overnight or otherwise, while the child resided with the parent.

About a year after the divorce, Mother began a relationship with a same-sex partner, M.C., with whom she now lives.[1] At some point, Father married his current wife. In January 2001, upon agreement of the parties, the trial court modified the parenting plan to designate Mother as the primary residential parent of Son as well as Daughter. This modified parenting plan likewise did not prohibit the parties from having an overnight paramour in the presence of the children.

In August 2002, Mother moved to North Carolina with her partner M.C.[2] At that time, Mother and Father agreed that Father would be the primary residential parent for the children.[3] Several years later, Mother moved back to Trenton, Gibson County, Tennessee, where Father lived along with his wife ("Stepmother") and the children. Mother's partner, M.C., lived in both North Carolina and in Trenton with Mother, "splitting time" between the two states.

---

[1]Non-parties in this lawsuit will not be referred to by their full names because of privacy concerns.

[2]Though the court documents indicate that Mother moved to Vermont, Mother reported that she in fact moved to North Carolina.

[3]Mother indicated that, at the time she moved, the parties had agreed that the children would join her when she was settled in North Carolina, but that Father subsequently "had gone back on his word."

After Mother moved back to Tennessee, on May 22, 2007, Father filed a petition to modify the parties' parenting plan. Mother filed a counter-petition for modification. On November 19, 2007, the trial court entered a consent order requiring all of the parties involved -- Father, Mother, Stepmother, M.C., and the two children -- to make themselves available for psychological evaluations and testing. The trial court also ordered that, pending final resolution, Father would be the primary residential parent of Son, and Mother would be the primary residential parent of Daughter.

The court-ordered evaluations were conducted by clinical psychologist David Pickering, Ph.D. ("Dr. Pickering"). On May 1, 2008, after completing the evaluations, Dr. Pickering submitted his report to the trial court. The report detailed the results of the mental status examinations and psychological testing for each subject, as well as observations about the parties' interactions with their respective partners and with the children. The report indicated that Son had a positive relationship with both parents, as well as Stepmother and M.C. The report also indicated that Daughter had a positive relationship with Mother and M.C., and that she had a fair relationship with Father. However, Dr. Pickering had substantial criticism of Stepmother and her parenting of Daughter, and he indicated that, unfortunately, Father tended to follow Stepmother's lead with Daughter. He characterized Daughter's relationship with Stepmother as quite problematic. Dr. Pickering indicated that Daughter suffered from depression stemming from her difficult relationship with Stepmother and opined that requiring Daughter to continue to reside with Stepmother would cause Daughter's emotional condition to further deteriorate.

In the conclusion of his report, Dr. Pickering recommended that Father remain the primary residential parent of Son, and that Mother remain the primary residential parent of Daughter. He noted that this arrangement would expose Daughter to Mother's paramour (M.C.) when she stayed at Mother's home and weighed this against the potential damage to Daughter's mental and emotional state from continuing to reside with Stepmother:

Father is married to [Stepmother], so [Daughter] and [Son] are not exposed to any paramours at their father's home. However, since [Mother] is involved in a same sex relationship, and the State of Tennessee does not allow or recognize either same sex marriage or civil unions, their exposure to [M.C.], by definition, involves exposure to their mother's paramour. [Son] has positive relationships with all adults in this evaluation, and there appears to be no reason living with one parent would be better for him than living with the other. However, [Daughter's] relationship with [Stepmother] is so extremely negative, and [Stepmother's] actions toward [Daughter], no matter how good intentioned, appear to be exacerbating her depression, and could also be encouraging [Daughter] to behave negatively as an oppositional response to demands she perceives from [Father]. If [Daughter] were to live with [Father and Stepmother], it is likely the situation will deteriorate further, rather than improve. It is therefore recommended that the children's wishes guide the resolution of this situation. I would recommend placement with [Father and Stepmother] for [Son], and with [Mother] for [Daughter].

Dr. Pickering recommended liberal visitation for each parent and suggested that the children should be allowed to have frequent visitation together in the same household. He cited research showing no adverse impact on children living with parents with same-sex partners, and he indicated that the trial court would need to address issues involving the cohabitation of Mother and M.C. "It will be for the court to decide [issues] concerning [M.C.], due to the paramour clause in most visitation orders. However, current results do indicate [M.C.] is a positive parent surrogate for both children, and has appropriate relationships with them both."

On May 15, 2008, a hearing was conducted on the

parties' motions for modification of the parenting plan. Dr. Pickering's report was submitted to the trial court for review and was entered into evidence. The parties told the trial court that they had agreed to follow the recommendations in Dr. Pickering's report regarding the shared parenting provisions. Accordingly, they completed a standard form permanent parenting plan, developed by Tennessee's Administrative Office of the Courts ("AOC"), setting out the terms of the residential schedules for the children. This form included what is known as a "paramour provision," stating that "[a]ny paramour of any parent and that parent are not to spend the night in the same residence when that parent and one of the minor children are present." The AOC form is consistent with Rule 23:00 of the Rules of Chancery Court for the 28th Judicial District ("Local Rule 23"), which requires inclusion of the paramour provision in the AOC permanent parenting plan form.

Although Mother generally agreed with the permanent parenting plan, she objected to the inclusion of the paramour provision, given that M.C. lived with her in her home. The trial court noted Mother's objection but insisted that the paramour provision remain intact "like all in the rest of [parenting plans in] the state of Tennessee." The trial court clarified that "we're not talking about adverse impact [on the children] . . . . We're not going to make a distinction between paramours of one sex or the other." The trial court added, "I'm not saying that [Mother] and [M.C.] cannot be together. I'm specifically saying that they cannot sleep together while a child is in the house. . . . Apparently, Dr. Pickering found [M.C.] to be a positive influence. The issue is paramour overnight." The trial court reiterated, "I think that's a policy across the state of Tennessee. I don't know any Judge in this state that does not preclude paramours overnight when the children are present in the home." The trial court commented that, "if there's a reason not to put that in a permanent parenting plan, this will have to come from the wisdom of our appellate courts."

Within weeks after the hearing, Mother and Daughter moved back to live with M.C. in North Carolina. Naturally, this relocation altered the parties' parenting arrangements and also

hindered the ability of Son and Daughter to see each other. The parties continued to agree that Mother would be the primary residential parent for Daughter, and Father agreed to Daughter's relocation to North Carolina with Mother. As before, the parties completed a parenting plan setting out the terms of the children's residential schedules. On September 4, 2008, the trial court entered an order consistent with the parties' agreement, and on October 2, 2008, it signed the new parenting plan. The final order and the parenting plan both included the paramour provision to which Mother had objected at the May 15, 2008 hearing. The order stated that, "as a matter of law, the paramour clause is required by the laws and public policy of the State of Tennessee . . . ." The trial court noted in its order that Mother reserved the right to challenge on appeal the inclusion of the paramour provision based on her view that such a provision is not required as a matter of law and that, in the alternative if such a provision is required, it violates her constitutional rights to equal protection, privacy, and due process.

*Barker v. Chandler*, No. W2008-0225-COA-R3-CV, 2009 WL 2986105 at *1-4, (Tenn. Ct. App. Sept. 18, 2009).

This Court reviewed the trial court's decision to include a paramour provision in the parties' parenting plan, based upon its finding that it was required by law to include such a provision. *Id.* In the first appeal, this Court held that "the trial court was not required to include the paramour provision in the permanent parenting plan" and directed the trial court to consider Mother's argument in light of our finding, considering the best interests of the children. *Id.* at *5.

Upon remand, the trial court held a hearing on March 24, 2010. At this hearing, counsel for both parties announced to the trial court that since the original appeal, the parties had modified the parenting plan by agreement.[4] Under the new plan, Father would be the primary residential parent for both children. Mother would have parenting time either during

---

[4]We recognize that a copy of the modified parenting plan does not appear in the record. However, the terms of the modified parenting plan are undisputed and appear in the transcript from the March 24, 2010 hearing. On June 2, 2008, this Court entered an Order granting Mother's motion to suspend the Rules of Appellate Procedure pursuant to TN. R. App. P. 2 and directed the trial court to file a supplemental record containing (1) a transcript from the December 3, 2009 hearing, and (2) the May 10, 2010 order with its attached and incorporated transcript from the March 24, 2010 hearing.

fall or spring break, one week at Christmas, and for the month of June. The Daughter had returned to Tennessee at the beginning of the school year to live with Father. Mother testified that Daughter had returned to Tennessee in order to attend the school she knew and be with her friends. Further, Mother testified that the paramour provision had caused significant financial hardship on her family and had prevented her children from visiting her at her home since July 2009. Mother testified that she and M.C. had maintained separate residences due to the paramour provision, but could no longer do so because of the cost. Mother also testified that the separate residences disrupted her "family unit" which she defined to include herself, M.C., and her two children. Also, Mother testified that because of the paramour provision, she had to stay with a relative in Tennessee when exercising her visitation. Mother explained that she thought M.C. was a positive influence on the children. Father chose not to testify at this hearing and in fact, did not offer any proof. However, the trial court stated that it wanted to hear from Father and accordingly, Father testified. Father testified that he did not think the paramour provision was enforceable as long as Mother lived in North Carolina. Other than the enforcement issue, Father did take a position as to the paramour provision or testify to any harm which would be caused if there was not a paramour provision in effect. Further, Father testified that the children pretty much decide when they want to visit their Mother and indicated that he had no objection to them seeing their Mother whenever they want. Moreover, at trial Dr. Pickering's report, previously discussed, was entered into evidence.

Following the conclusion of proof, the trial court ruled from the bench. The trial court found that it was in the best interests of the children that the parenting plan contain a paramour provision. As stated by the trial court:

> In the state of Tennessee the best interest of the child is paramount. We must respect the child and acknowledge that they are most vulnerable parties in the proceedings; thus regardless of circumstances their best interest must be the central concern. It is of great concern to this Court that [Daughter] returned to the home of her father after staying with [Mother] until July 2009 after her formerly strongly-held views as reported by the evaluation of Dr. Pickering. See Exhibit 1.
>
> Court finds that though [Mother] found the paramour clause to be inconvenient and had no concerns if her former husband should have a paramour overnight with his children present, the Court finds that the admonition in the other section of the permanent parenting plan is in the best interest of the children. A paramour overnight, abuse of alcohol and abuse of

drugs are clearly common sense understanding that children can be adversely affected by such exposure, as found from the legions of cases in the state of Tennessee.

An order was entered reflecting this decision and incorporating by reference the transcript on May 10, 2010.

Mother appeals from the trial court's decision and raises one issue for our review:

Whether the trial court, on remand from this Court, erred as a matter of law and infringed upon Mrs. Chandler's constitutional rights by continuing to impose, *sua sponte*, an overnight "paramour" restriction despite undisputed evidence that the restriction is contrary to the best interests of the children and despite the absence of any evidence in the record that would support a conclusion that such a restriction is in the best interests of the children?

We note that Father chose not to participate in this appeal. [5]

**Standard of Review**

This court hesitates to second-guess a trial court's determination regarding parenting schedules. *Small v. Small*, No. M2009-00248-COA-R3-CV, 2010 WL 334637 (Tenn. Ct. App. Jan 28, 2010)(citing *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999)). "Trial courts have broad discretion in devising permanent parenting plans.... In reaching such decisions the courts should consider the unique circumstances of each case." *Burton v. Burton*, No. E2007-02904-COA-R3-CV, 2009 WL 302301, at *1 (Tenn. Ct. App. Reb. 9, 2009)(citing *Parker*, 986 S.W.2d at 563). In making these decisions, the paramount interest of the court is the welfare of the child. *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). As stated in the first appeal, "Tennessee courts have long held that the best interest of the child is the single most important factor in matters involving parenting time and visitation...." *Barker*, 2009 WL 2986105 at *5 (citations omitted). We will not reverse the trial court's decision absent an abuse of discretion. *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)(quoting *Edwards v. Edwards*, 501 S.W.2d 286, 291 (Tenn. Ct. App. 1973)). A trial court abuses its discretion "when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d

_____

[5]Father chose not to file an Appellee brief. He did provide a letter this the Court stating that he was not participating in this appeal.

82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

**Analysis**

After reviewing the record, we find that the trial court abused its discretion in requiring the paramour provision. The record is devoid of any evidence whatsoever to support the finding that a paramour provision is in the best interests of the children. In fact, the record contains evidence demonstrating that a paramour provision is contrary to the best interests of the children. Mother testified that she has not been able to visit with the children at her home since July 2009 due to the paramour provision currently in effect. Mother testified that under the previous custody arrangement, the children would stay overnight while she and M.C. were living together in Tennessee and that the children never expressed any concerns about the situation. Moreover, Dr. Pickering, after interviewing Mother, Father, Daughter, Son, Step-Mother, and M.C, and observing them together, stated in his report that both Daughter and Son view their relationship with M.C. as typical of adolescents with their parent/parent surrogate. After observing Mother, M.C., Daughter and Son together, Dr. Pickering found that both children interacted well with M.C., and that she "interact[ed] with them in a positive and supportive manner." Further, in comparing Stepmother and M.C., Dr. Pickering found that M.C was the better "surrogate parent." As stated by Dr. Pickering, M.C. "appears to be emotionally stable and capable of providing appropriate support and nurturing to the children and to [Mother]. Conversely, Dr. Pickering found that Stepmother "tended to deny even minor problems, tended to be demanding and immature, and self-centered." Dr. Pickering also found that M.C.'s training in the area of social work was a positive factor. Dr. Pickering found that both Mother and M.C. interact more positively with both children than Father and Stepmother. Dr. Pickering recognized that M.C. was a paramour, but did not recommend restricting visitation in any manner. Instead, Dr. Pickering found M.C. to be "a positive parent surrogate for both children, and has appropriate relationships with them both. Further, research indicates that children raised in homes with same sex parents/parent surrogates tend to develop normal social relationships, and are no more likely to display same sex sexual orientation than children raised in more traditional two parent homes." Father did not produce any evidence that a paramour provision was in the best interests of the children. We recognize the trial court's concern with Daughter's return to Tennessee to live with her Father. However, other than the trial court's comments, there is nothing in the record to indicate that she returned home for any reason other than to attend her previous school and be with her friends.

Finding the record completely devoid of any evidence demonstrating that the paramour provision is in the best interests of the children or that the presence of Mother's partner in the home has any harmful effect on the children, we find that the trial court abused its discretion. *See Small v. Small*, 2010 WL 334637 at *19 (finding that the trial court

abused its discretion by imposing a restriction prohibiting father's paramour from coming into contact with the child as there was no evidence of harm to the child). Therefore, we reverse the decision of the trial court finding that it is in the best interests of the children that the parenting plan contain a "paramour provision." Costs of this appeal are assessed to Appellant, Angel Chandler and her surety for which execution may issue if necessary.

 

_____

J. STEVEN STAFFORD, JUDGE